# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **NON-** |
| v. ) | **CONFIDENTIAL** |
| ) | Proprietary |
| UNITED STATES, ) | Information |
| ) | Removed from Pages |
| Defendant, ) | 25, 26, and 39 |
| ) | |
| and, ) | Court No. 21-00012 |
| ) | |
| NUCOR CORPORATION, ) | |
| ) | |
| Defendant-Intervenor. ) | |

# PLAINTIFF HYUNDAI STEEL COMPANY'S BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins

MORRIS, MANNING & MARTIN, LLP
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

June 21, 2021

*Counsel to Plaintiff Hyundai Steel Company*

14358460–1

# TABLE OF CONTENTS

I.    STATEMENT PURSUANT TO RULE 56.2 ....................................2

II.   ISSUES OF LAW PRESENTED AND REASONS FOR
      CONTESTING THE ADMINISTRATIVE DETERMINATION .....2

III.  STATEMENT OF FACTS .................................................................3

IV.   SUMMARY OF ARGUMENT ........................................................13

V.    STANDARD OF REVIEW .............................................................16

VI.   ARGUMENT ...................................................................................17

      A.   Commerce's Determination That Hyundai Steel's Sewerage
           Usage Fees Are Countervailable Is Unsupported By
           Substantial Evidence And Is Otherwise Not In Accordance
           With Law. ...............................................................................18

           1.   Hyundai Steel's Payment of Sewerage Fees Was Fully
                In Accordance With Korean Law And Thus Commerce's
                Finding To The Contrary Is Not Supported By
                Substantial Evidence. ..................................................20

                a.   Hyundai Steel's Sewerage Fees Were Calculated
                     Pursuant To Korean Law. ..................................20

                b.   Commerce's Conclusion That Korean Law Did
                     Not Provide For Hyundai Steel's Sewerage Fee
                     Reductions Is Not Supported By Substantial
                     Evidence And Is Contrary To Law. ...................27

           2.   The Amount Of The Sewerage Fee Reductions Received
                By Hyundai Steel Are Consistent With Korean Law..36

      B.   Hyundai Steel Did Not Receive A Countervailable Subsidy
           In Connection With Its Payment Of  Sewerage Usage
           Fees.........................................................................................40

           1.   Hyundai Steel Received No Financial Contribution
                Because The Government Of Korea Did Not Forego
                Any Revenue Otherwise Due. ......................................41

           2.   Hyundai Steel Did Not Receive A Countervailable
                Benefit Because The Sewerage Usage Fees Were

Directly Proportional To Its Usage Of The Public
Sewerage System. ......................................................... 46

C.  Hyundai Steel's Sewerage Fees Should Not Be Attributed To
Production Of Subject Merchandise As They Are Tied To
Non-Subject Merchandise, A Substantial Issue Commerce
Failed To Address In The *Final Results*. ............................ 51

1.  Hyundai Steel's Sewerage Usage Fees Apply Only To
Its Incheon Facility And Cannot Benefit Its Production
Of Subject Merchandise. ............................................... 51

2.  Commerce's *Final Results* Are Not Supported By
Substantial Evidence Because They Fail To Address
Hyundai Steel's Argument That The Sewerage Usage
Fees Are Tied To Non-Subject Merchandise. .............. 55

VII.  CONCLUSION AND RELIEF REQUESTED ............................... 58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,*
  61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ............................ 54, 55, 57

*Commc'n Workers of Am. Loc. 4123 v. U.S. Sec'y of Labor,*
  No. 20-00075, Slip Op. 21-53 (Ct. Int'l Trade May 4, 2021) .............. 29

*Corley v. United States,*
  556 U.S. 303 (2009) ............................................................... 44

*Fine Furniture (Shanghai) Ltd. v. United States,*
  748 F.3d 1365 (Fed. Cir. 2014) ...................................... 30, 32

*Government of Sri Lanka v. United States,*
  308 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ..................... 44, 47, 49, 50

*Jinan Yipin Corp. v. United States,*
  31 CIT 1901, 526 F. Supp. 2d 1347 (2007) ......................... 28

*Kisor v. Wilkie,*
  139 S. Ct. 2400 (2019) ........................................................ 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .......................................................... 56, 57

*Nat'l Mining Ass'n v. Mine Safety & Health Admin.,*
  116 F.3d 520 (D.C. Cir. 1997) .............................................. 57

*New Am. Keg v. United States,*
  No. 20-00008, Slip Op. 21-30 (Ct. Int'l Trade Mar. 23, 2021) ........................................................................... 32-33, 57

*NMB Singapore Ltd. v. United States,*
  557 F.3d 1316 (Fed. Cir. 2009) ........................................... 56

*Nucor Corp. v. United States*,
    461 F. Supp. 3d 1374, 1380 (Ct. Int'l Trade 2020) ............................ 56

*Shelter Forest Int'l Acquisition, Inc. v. United States*,
    497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021) ........................... 34, 35, 36

*SKF USA Inc. v. United States*,
    630 F.3d 1365 (Fed. Cir. 2011) ......................................................... 56

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ......................................................................... 31

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ......................................................................... 31

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) ......................................................... 29

## Statutes

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................... 16, 32

19 U.S.C. § 1677(5)(B) .............................................................. 17, 40

19 U.S.C. §1677(5)(D) ............................................................... 41, 42

19 U.S.C. § 1677(5)(E) ................................................. 46, 47, 48, 50

19 U.S.C. § 1677(5A) ................................................................. 17, 40

19 U.S.C. § 1677m(d) ........................................................................ 32

19 U.S.C. § 1677m(i) ........................................................................ 32

## Regulations

19 C.F.R. § 351.106(c) ............................................................ 6, 10, 17

19 C.F.R. § 351.503(b)(1) .................................................................. 47

19 C.F.R. § 351.503(b)(2) .................................................................. 47

19 C.F.R. § 351.511(a)(2)(iii) ............................................................ 33

19 C.F.R. § 351.525(b)(5) ........................................................................... 51

**Other Authorities**

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce
    Nov. 25, 1998) ................................................................... 48, 49, 52

*Final Affirmative Countervailing Duty Determinations;*
    *Certain Steel Products From Belgium*, 47 Fed. Reg.
    39,304 (Dep't Commerce Sept. 7, 1982)............................................. 52

H.R. Rep. No. 96-317 (1979)................................................................... 52

S. Rep. No. 96-249 (1979), *reprinted in* 1979 U.S.C.C.A.N.
    381 ..................................................................................................... 53

Uruguay Round Agreements Act, Statement of
    Administrative Action, H.R. Rep. No. 103–316, vol. 1
    (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040................................ 29, 42

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **NON-** |
| v. ) | **CONFIDENTIAL** |
| ) | Proprietary |
| UNITED STATES, ) | Information |
| ) | Removed from Pages |
| Defendant, ) | 25, 26, and 39 |
| ) | |
| and, ) | Court No. 21-00012 |
| ) | |
| NUCOR CORPORATION, ) | |
| ) | |
| Defendant-Intervenor. ) | |

## PLAINTIFF HYUNDAI STEEL COMPANY'S BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

In accordance with Rule 56.2 of the Rules of this Court, and the April 16, 2021 Scheduling Order, ECF No. 27, Plaintiff Hyundai Steel Company ("Hyundai Steel" or "Plaintiff") files this brief in support of its Rule 56.2 motion for judgment upon the agency record. As discussed below, the U.S. Department of Commerce's ("Commerce") *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law.

1

## I.   STATEMENT PURSUANT TO RULE 56.2

The administrative determination under review is Commerce's final results in the countervailing duty administrative review of certain cut-to-length carbon-quality steel plate (or "subject merchandise") from the Republic of Korea. *See Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; Calendar Year 2018*, 85 Fed. Reg. 84,296 (Dep't Commerce Dec. 28, 2020) ("*Final Results*") (Appx1059-1060), and accompanying Issues and Decision Memorandum (Appx1032-1058).

## II.   ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE ADMINISTRATIVE DETERMINATION

1.   Whether Commerce's determination that Hyundai Steel received a financial contribution from the Government of Korea in connection with its payment of sewerage fees is supported by substantial evidence and otherwise in accordance with law where Hyundai Steel paid the full amount of sewerage fees based on its proven usage as permitted under Korean law.

2.   Whether Commerce's determination that Hyundai Steel received a countervailable benefit from the Government of Korea in connection with its payment of sewerage fees is supported by

2

substantial evidence and otherwise in accordance with law where the amount Hyundai Steel paid in sewerage fees was directly proportional to the amount of sewerage it discharged into the public sewer system.

3.    Whether Commerce's determination that Hyundai Steel received a countervailable subsidy in connection with its payment of sewerage fees is supported by substantial evidence and is otherwise in accordance with law where Commerce failed to explain or address arguments made by Hyundai Steel that any benefits it may have received were tied to non-subject merchandise.

## III.  STATEMENT OF FACTS

On May 2, 2019, Commerce initiated an administrative review of the countervailing duty order on cut-to-length carbon-quality steel plate from the Republic of Korea. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 18,777 (Dep't Commerce May 2, 2019) (Appx15448-15467). Commerce's period of review covered entries made by Hyundai Steel from January 1, 2018 to December 31, 2018.

Hyundai Steel was chosen as a mandatory respondent in the review, Appx15563-15567, and filed its response to Commerce's initial

3

questionnaire on July 29, 2019. In response to the "Other Subsidies" portion of Commerce's initial questionnaire, Hyundai Steel reported that it participated in a program that Hyundai Steel described as "Reduction for Sewerage Usage Fee." Appx6213-6214. Under this program, persons that use the public sewer system can qualify for reductions in their sewerage fees for certain reasons, including being able to demonstrate that the amount of sewerage actually discharged into the public sewer system is less than the amount of clean water consumed. *Id.*; *see also* Appx14974. Hyundai Steel reported that it qualified for sewerage fee reductions based on its actual discharge of sewerage, which was less than the amount of clean water it consumed. Appx6213-6214.

Specifically, Hyundai Steel explained that because it uses a significant amount of water for cooling machinery and merchandise at very high temperatures, a significant volume of the water it consumes is vaporized in the cooling process, thereby reducing Hyundai Steel's volume of wastewater. Appx6213. Pursuant to Article 21(1)(7) of the Regulation on Sewerage Usage of the Incheon Metropolitan City

4

("Ordinance"),[1] and Article 9 of the Enforcement Regulation, Hyundai Steel's sewerage fees were reduced and it was only charged for the wastewater it introduced into the Incheon City sewerage system (*i.e.*, the volume of water that actually needed to be purified by the Incheon City purification facility). *See* Appx6213-6214, Appx8227-8232, Appx8234-8235. Commerce asked no further questions about this program or the legal basis for Hyundai Steel receiving sewerage fee reductions.

Commerce issued the *Preliminary Results* on February 28, 2020, which were published in the *Federal Register* on March 6, 2020. *See Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; Calendar Year 2018*, 85 Fed. Reg. 13,136 (Dep't Commerce Mar. 6, 2020) ("*Preliminary Results*") (Appx1017-1019), and accompanying Decision Memorandum (Appx1000-1016). Commerce preliminarily calculated an *ad valorem* subsidy rate of 0.49 percent for

---

[1] While Hyundai Steel translated the title of the local regulation as "Regulation on Sewerage Usage of the Incheon Metropolitan City," the Government of Korea translated this title as "Incheon Metropolitan City Ordinance on Sewerage System Use." *See* Appx15015. Thus, Hyundai Steel hereinafter refers to these regulations as the "Ordinance."

Hyundai Steel, which is *de minimis* under Commerce's regulations. *See* 19 C.F.R. § 351.106(c). The sewerage fee program was not included in the *Preliminary Results*. Instead, Commerce stated that it would issue its preliminary findings regarding these fees "in a post-preliminary decision memorandum." Appx1016.

On March 6, 2020, Commerce issued a supplemental questionnaire to the Government of Korea, requesting that it respond to the Standard Questions and Usage Appendices regarding the sewerage fee program that Hyundai Steel reported. *See* Appx15948-15950. No separate questionnaire was issued to Hyundai Steel, which had previously disclosed its usage of this program in its initial questionnaire.

On March 25, 2020, the Government of Korea filed its response to Commerce's supplemental questionnaire, providing the requested responses regarding Hyundai Steel's sewerage usage fees. In its response, the Government of Korea stated that pursuant to Article 36 of the Presidential Decree to the Sewerage Act ("Presidential Decree"), sewage fees "must be calculated on the basis of the amount and type of the sewage water drained down the system." Appx14974. Authority to calculate and charge such fees is delegated to regional level

6

governments. Appx14975. However, the Government of Korea explained that users of the public sewerage system normally do not have meters to gauge the amount of sewage they introduce into the public system. Thus, for practical reasons, regional authorities will generally use the volume of clean water consumed from the public system as a proxy for the volume of wastewater introduced into the public sewerage system in order to calculate the sewerage usage fee. Appx14974. This presumption was codified by the Incheon Metropolitan City in Article 14(1) of the Ordinance. Appx14977, Appx15010, Appx15015.

Notwithstanding this presumption, the Government of Korea reported that if a person can demonstrate that the volume of wastewater it introduces into the public system is less than the volume of clean water it consumes, the local authorities will base the sewerage usage fees on the volume of sewage that the entity has demonstrated that it introduced into the public system. Appx14974. The Government of Korea stated that the legal basis for recalculating a company's sewerage fees in this manner was Article 21(1)(7) of the Ordinance and Article 9 of the Enforcement Regulation. Appx14977, Appx15010-15012, Appx15015-15018.

The Government of Korea explained that Hyundai Steel demonstrated through a report published by an independent third party that the volume of wastewater that it introduced into the public system was far less than the volume of clean water that it consumed. Appx14976-14977. This third party report was submitted in connection with Hyundai Steel's application to request that its sewerage fees be calculated based on its actual usage. The Incheon municipal authority reviewed and approved Hyundai Steel's application, and Hyundai Steel's proven wastewater volume was used as to calculate the amount of sewerage fees owed. *Id.* The Government of Korea provided all of the relevant statutes and regulations in its response, as well as Hyundai Steel's application, approval letter, third-party report, and sample water bill that demonstrated the sewerage fees that Hyundai Steel paid. *See* Appx15008-15018, Appx15020, Appx15026-15051. Both Hyundai Steel's application and approval letter cite the relevant regulations under which Hyundai Steel's fee reductions were approved – *i.e.*, Article 21 of the Ordinance and Article 9 of the Enforcement Regulation. Appx15026-15027, Appx15039-15040.

In addition, the Government of Korea explained that an entity can

8

reduce its sewerage usage fees by other means, including by installing a "gray water system," which "processes unclean water for recycling purpose{s} without discharging unclean water into the public sewerage system." Appx14974. Neither the Government of Korea nor Hyundai Steel reported that Hyundai Steel had installed or used such a gray water system.

On August 6, 2020, Commerce issued a post-preliminary results decision memorandum ("*Post-Preliminary Results*") in which it preliminarily determined, *inter alia*, that Hyundai Steel "had installed a gray water system" that allowed it to reduce its water bill. Appx1021. Commerce went on to describe how the gray water system works, ultimately concluding that "the reduction in sewerage fees under this program results in a financial contribution from the {Government of Korea} . . . in the form of revenue forgone." Appx1021-1023. Commerce further concluded that the program is *de facto* specific "because Hyundai Steel received a predominant amount of the benefits under the program," and the benefit is the "difference between the amount of water fees paid by Hyundai Steel and the amount of water fees that it would have paid in the absence of this program." Appx1022-1023 (citing

19 U.S.C. § 1677(5)(E) & (5A)(D)(iii)(II)). Commerce calculated a net subsidy rate of 0.01 percent *ad valorem* for the sewerage fee reduction program, Appx1023, bringing Hyundai Steel's total subsidy rate to 0.50 percent, which is just over the *de minimis* threshold under Commerce's regulations, *see* 19 C.F.R. § 351.106(c) (defining the *de minimis* rate in administrative reviews as a rate "that is *less than* 0.5 percent") (emphasis added).

On August 19, 2020, Hyundai Steel filed its case brief, arguing, *inter alia*, that Commerce had incorrectly determined that Hyundai Steel installed a gray water system and erred in finding that the reductions in its sewerage usage fees were countervailable. *See* Appx15256-15264. Stating the facts described above, Hyundai Steel reiterated that the reduction of its sewerage fees was not contingent on installing a gray water system (which it did not install), but rather the local authority calculated Hyundai Steel's sewerage fees based on the proven amount of wastewater it introduced into the public system, as the Government of Korea explained. Appx15256-15260. Thus, Hyundai Steel argued that Commerce erred in determining that the sewerage fee reductions constituted a financial contribution in the form of "revenue foregone"

10

and in determining that there was a benefit conferred to Hyundai Steel. Appx15261-15263. Finally, Hyundai Steel argued that should Commerce continue to treat the fee reductions as countervailable, it should find that they were tied to non-subject merchandise because Hyundai Steel does not produce subject merchandise at its Incheon facility where the fee reductions were provided. Appx15263-15264.

The Government of Korea also filed a case brief, explaining that the Korean laws and regulations allow the local authorities to more accurately assess sewerage fees for companies like Hyundai Steel that discharge less wastewater than clean water they consume. Appx16028-16032. The Government of Korea explained that there is no benefit to these companies because their fees are assessed on the proven sewerage volume they introduce into the public system. Thus, the Government of Korea argued that Hyundai Steel did not receive any discount or exemption on its sewerage fees as Commerce had stated in the *Post-Preliminary Results*. *Id.*

On December 18, 2020, Commerce issued the *Final Results*, which were published in the *Federal Register* on December 28, 2020. *See* Appx1032-1058; Appx1059-1060. In the *Final Results*, Commerce

continued to find that Hyundai Steel's sewerage fee reductions were countervailable, stating that none of the Korean legal provisions cited by the Government of Korea "prescribe for the situation under which Hyundai Steel qualified for its sewerage fee reduction, or the amount of the reduction received by Hyundai Steel."[2] Appx1051. Commerce found that these legal provisions "do not explicitly provide that entities may claim a reduction in their overall water bill with regard to the amount of sewage water discharged." *Id.* Thus, contrary to the Government of Korea's explanation, Commerce determined that "the basis under which Hyundai Steel received a sewerage fee reduction" was an "arrangement unique to {Hyundai Steel} and not otherwise contemplated under the provisions of Korean law on our record." *Id.* Commerce therefore concluded that the reduction of Hyundai Steel's sewerage fees constitutes revenue foregone, provides a benefit, and is *de facto* specific. Appx1501-1502 (citing 19 U.S.C. § 1677(5)(D)(ii), (5)(E), & (5A)(D)(iii)(I)).

---

[2] Specifically, Commerce referenced "Article 65(1) of the Sewerage Act, Article 36(2) of the Enforcement Decree of the same Act, Article 14(1) and Article 21(1)(7) of the Incheon Metropolitan City Ordinance on Sewerage System Usages, and Article 9 of the Enforcement Decree of the same Ordinance." Appx1051.

Commerce did not acknowledge or address Hyundai Steel's argument from its case brief that the fee reductions were tied to non-subject merchandise because Hyundai Steel does not produce subject merchandise at its Incheon facility.

Accordingly, in the *Final Results*, Commerce continued to calculate an *ad valorem* subsidy rate of 0.50 percent for Hyundai Steel. Appx1060. This was just over the *de minimis* threshold, as stated above. This appeal followed.

## IV.   SUMMARY OF ARGUMENT

Under Korean law, the regional government water authority applies a rebuttable presumption that the amount of clean water consumed by a customer is equivalent to the amount of sewerage it discharges into the public sewer system. This is a sensible presumption given that most consumers cannot measure the amount of sewerage they discharge into the public system. Korean law, however, also provides a mechanism whereby customers can rebut this presumption by demonstrating the actual amount of sewerage discharged into the public sewer system. Doing so requires the customer to incur the time and expense of demonstrating actual usage to the water authorities' satisfaction.

Hyundai Steel utilizes water as part of its production process, and much of it is vaporized or otherwise used in the course of its normal operations and is thus not discharged into the public sewer system. As such, the presumption that clean water consumed equals sewerage discharged does not apply to Hyundai Steel and results in an overcharge in fees. In order to avoid this overcharge, Hyundai Steel incurred the cost of commissioning an independent study to demonstrate the amount of sewerage it actually discharged into the public sewer system. This study was reviewed and accepted by the Korean water authority. Hyundai Steel was thus charged sewerage fees based on its actual proven discharge of sewerage into the public sewer system in accordance with Korean law. This sewerage fee arrangement only applied to Hyundai Steel's Incheon production facility, which does not produce subject merchandise.

In the *Final Results*, Commerce determined that this payment of sewerage fees based on actual proven usage provided Hyundai Steel with a countervailable subsidy. More specifically, Commerce found that the government provided Hyundai Steel with a financial contribution in the form of revenue foregone. This appears to mean that the

14

government could have received more revenue had it charged Hyundai Steel based on the rebuttable presumption that the amount of clean water consumed equaled the amount of sewerage discharged. Commerce also found that this "foregone revenue" provided Hyundai Steel with a countervailable benefit based on the difference between what Hyundai Steel would have paid using the rebuttable presumption and what it paid based on its actual usage. Commerce also ignored Hyundai Steel's argument that even if considered a benefit, this sewerage fee arrangement is not countervailable because it only applied to Hyundai Steel's Incheon facility that does not produce subject merchandise.

Commerce's decision is not supported by substantial evidence and is otherwise not in accordance with law. The evidence shows that Hyundai Steel paid sewerage fees based on its actual proven discharge of sewerage into the public sewer system. This method of payment is provided for under Korean law and results in companies like Hyundai Steel paying what they actually owe instead of being overcharged based on the presumption. This arrangement does not result in the government foregoing any revenue otherwise due but instead right sizes

15

what is actually owed and prevents overcharge. Nor does it provide a benefit because the record shows that Hyundai Steel paid sewerage fees based on its actual proven discharge. It was not better off than it would have otherwise been absent the program. Finally, even if this were wrongly considered to be a countervailable subsidy, it is tied to Hyundai Steel's production of non-subject merchandise and thus provides no benefit to the production or export of the subject merchandise that is the subject of Commerce's review.

Hyundai Steel urges the Court to examine this program in its entirety and determine whether the payment of sewerage fees based on actual usage as provided for under Korean law results in a countervailable subsidy. Logic and the law dictate that it does not.

## V.   STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination in a countervailing duty administrative review, the Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## VI.  ARGUMENT

This case involves Commerce's determination that Hyundai Steel received a countervailable subsidy from the Government of Korea. In order to find that a countervailable subsidy exists, Commerce must determine that a government authority has provided (i) a financial contribution, that (ii) confers a benefit, and that (iii) is specific. *Id.* § 1677(5)(B) & (5A). This case presents a challenge to Commerce's determination that Hyundai Steel received a financial contribution and benefit from the Government of Korea in connection with its payment of sewerage fees. Specificity is not at issue. Although sewerage fees are not the most glamorous topic, this issue is of the utmost importance to Hyundai Steel given that it is the difference between receiving a *de minimis* subsidy margin or one that is just above *de minimis*. *De minimis* means Hyundai Steel receives refunds of all the countervailing duty cash deposits it paid in calendar year 2018; over *de minimis* means it does not. *See* 19 C.F.R. § 351.106(c).

A. **Commerce's Determination That Hyundai Steel's Sewerage Usage Fees Are Countervailable Is Unsupported By Substantial Evidence And Is Otherwise Not In Accordance With Law.**

This case begins with Commerce's *Final Results* and the explanation Commerce provided for finding that Hyundai Steel received a financial contribution and benefit from the Government of Korea in connection with its payment of sewerage fees. The explanation is short and so we quote the relevant parts below that lay out Hyundai Steel's argument that the program provides no countervailable subsidy and Commerce's rejection of it and finding that Hyundai Steel received a countervailable subsidy:

> Hyundai Steel explained that it received a reduction in its overall water bill because it was able to demonstrate the estimated amount of sewer water it discharged and that needed to be recycled (*i.e.,* treated) by the Incheon City government during the {period of review}, which was significantly less than the amount of clean water it consumed. According to Hyundai Steel, it did this on the basis of a report it commissioned from an independent third party. The {Government of Korea} states that it accepted Hyundai Steel's methodology to determine the amount of sewer water the company is deemed to have drained into the public water system on the basis of Articles 14 and 21 of the Incheon Metropolitan City Ordinance on Sewerage System Use and Article 9 of the Enforcement Regulation of the same Ordinance.

18

Contrary to the claims by the {Government of Korea}, Article 65(1) of the Sewerage Act, Article 36(2) of the Enforcement Decree of the same Act, Article 14(1) and Article 21(1)(7) of the Incheon Metropolitan City Ordinance on Sewerage System Usages, and Article 9 of the Enforcement Regulation of the same Ordinance do not prescribe for the situation under which Hyundai Steel qualified for its sewerage fee reduction, or the amount of the reduction received by Hyundai Steel.  The relevant legal provision describing the basis for any such fee reductions, Article 21 ("Reduction and Exemption, etc.") of the Incheon Metropolitan City Ordinance on Sewerage System Usages, provides for fee reductions on the basis of other criteria and conditions.  Article 21, or any other legal provisions cited by the {Government of Korea}, do not explicitly provide that entities may claim a reduction in their overall water bill with regard to the amount of sewage water discharged.  Hyundai Steel did not qualify for a reduction in its sewerage fee on the basis of any of the criteria listed in the Incheon Metropolitan City Ordinance.  Additionally, the amount of the fee reduction that Hyundai Steel received on its overall water bill significantly exceeds the rate adjustments that are specified in the ordinance, with the exception of certain special conditions, such as being located in a disaster area.  For these reasons, we determine that the basis under which Hyundai Steel received a sewerage fee reduction during the {period of review} is an arrangement unique to the respondent and not otherwise contemplated under the provisions of Korean law on our record. We thus continue to find that the reduction in Hyundai Steel's sewerage fee under the program constitutes revenue foregone and that a benefit is conferred in accordance with sections 771(5)(D)(ii) and 771(5)(E) of the Act, respectively.

Appx1051 (citations omitted).

In essence, Commerce rejected Hyundai Steel's and the Government of Korea's explanations of Korean law and the basis on which Hyundai Steel paid its sewerage fees (*i.e.,* based on actual proven usage). Instead, Commerce relied on its own interpretation of Korean law to find that Hyundai Steel's reductions were outside the law and exceeded other rate adjustments for other situations. Aside from rejecting Hyundai Steel's and the Government of Korea's interpretation of Korean law, Commerce did not actually explain *how* the payment of sewerage fees based on the amount of sewerage that Hyundai Steel actually discharged into the public sewer system provided a financial contribution and benefit. As discussed more fully below, Commerce's decision is unsupported by substantial evidence and is otherwise not in accordance with law.

1.   **Hyundai Steel's Payment of Sewerage Fees Was Fully In Accordance With Korean Law And Thus Commerce's Finding To The Contrary Is Not Supported By Substantial Evidence.**

a.   **Hyundai Steel's Sewerage Fees Were Calculated Pursuant To Korean Law.**

An understanding of the Korean laws that govern the payment of sewerage fees is an essential starting point. The legal framework begins with Article 36(2) of the Presidential Decree, which "stipulates that the

service fee for the public sewerage system usages must be calculated on the basis of the amount and type of the sewage water drained down the system." Appx14974. Thus, Korean law, at the national level, requires that sewerage usage fees be calculated based on users' *actual usage* of the public sewerage system. *Id.* This is the overarching principle that governs the payment of sewerage fees. This principle is logical and equitable as it charges each user based on the burden it places on the public system – *i.e.*, the volume of water that requires purification treatment.

In turn, Article 65 of the Sewerage Act and Article 36 of the Enforcement Decree of the Sewerage Act delegate responsibility to calculate and collect these fees to the regional governments that operate the public sewerage systems. Appx14975, Appx15008-15009, Appx15013-15014. The regional governments therefore issue local regulations to administer the national law. Appx1475-1479, Appx15010-1512, Appx15015-15018. However, the regional authorities face a practical problem when assessing fees to users of the public sewerage system.

As the Government of Korea explained, most users normally do not have meters to gauge the actual volume of sewage water they introduce into the public system, but instead are only able to measure the volume of clean water they consume from the public water supply. Appx14974. To overcome this practical problem, regional authorities adopted a rebuttal presumption that users' input (clean water that can be measured) is equal to their output (wastewater that cannot be measured in most cases). In Hyundai Steel's case, Incheon Metropolitan City issued Article 14(1) of the Ordinance adopting this default presumption. *See* Appx15010, Appx15015.

For most users, this input-output presumption would be a reasonable proxy for the actual volume of sewerage introduced into the public system (*i.e.*, most of the water from the faucet ends up in the drain). *See* Appx16028. However, for Hyundai Steel, this presumption results in a significant *overcharge* in its sewerage usage fees. This is because Hyundai Steel uses a "significant amount of water for cooling machineries and merchandise" that operate at high temperatures, and thus a "significant volume of water used for such purpose is vaporized in the cooling process." Appx6214. Thus, the presumption that Hyundai

Steel's clean water volume is equal to the volume of wastewater it introduces into the public system grossly overstates the volume of wastewater it *actually* introduces into the public system.

To prevent this type of overcharge, Incheon Metropolitan City issued Article 21 of the Ordinance, which allows for reductions and exemptions in users' sewerage fees. Appx15010-15011, Appx15015-15017. These reductions can be issued for various situations such as for persons in disaster declaration areas or persons that install recirculation equipment. *Id.* The Ordinance also includes a "catch-all" provision (Article 21(1)(7)) that states that a reduction of sewerage fees may be granted to "{a} person {for whom} the Management Authority determines that there {is a} public interest or special reason{}." Appx15010, Appx15016. Recalculating the sewerage fee based on the proven usage volume instead of the clean water consumption volume because the former is lower than the latter (*i.e.*, rebutting the Incheon Metropolitan City's presumption), is considered in the "public interest" or as a "special reason{}" for the purpose of this article. *See* Appx14977-14979.

23

The last piece of the regulatory puzzle is found in Article 9 of the

Enforcement Regulation of the Ordinance, which requires that upon

receiving an application under Article 21, the regional government must

"conduct a factual investigation" of the basis of the application, *i.e.,*

verify it. Appx15012, Appx15018.

Consistent with this legal framework, Hyundai Steel reported in its

initial questionnaire response that

> Hyundai Steel's Incheon Plant has received reductions from the
> monthly fee incurred for usage of sewerage system for purification of
> sewage from Incheon City for reducing volume of wastewater which
> require sewage treatment by purification facility operated at Incheon
> City as prescribed in *Article 21(1) 7* of Regulation on Sewerage Usage
> Incheon Metropolitan City and Article 9 of Enforcement Regulation
> on Sewerage Usage Incheon Metropolitan City.

Appx6213 (emphasis added).

Hyundai Steel's qualification for the payment of sewerage fees based

on actual discharge was confirmed by the Government of Korea, which

cited to the very same legal provisions, including Article 21(1)(7) of the

Ordinance. Appx14977. The Government of Korea also confirmed that

Hyundai Steel qualified for such reductions based on showing that the

volume of wastewater it processes through the public sewage system is

much less than the volume of water it uses from the public water supply

NON-CONFIDENTIAL

system. Appx14976. Commerce asked no supplemental questions about the legal basis for Hyundai Steel qualifying for these sewerage fee reductions, or about the interpretation of Article 21(1)(7).

In accordance with this legal framework, Hyundai Steel submitted an application and supporting documents that demonstrated that its actual sewerage discharge was much lower than the amount of clean water consumed. *See* Appx15026-15051. To do so, Hyundai Steel hired, at its own expense, Kyung Hee University's Research Center to measure the volume of water Hyundai Steel actually introduced into the public system. Kyung Hee University studied Hyundai Steel's Incheon facility, measuring the actual water usage, production performance, and water discharge volume. *See* Appx15028-15038, Appx15041-15048. Based on its analysis, the Kyung Hee University determined that, due to Hyundai Steel's [

],

Hyundai Steel discharged a much lower sewerage volume than the clean water volume it consumed. *Id.*; *see also* Appx15258-15259. Specifically, the Kyung Hee University found that Hyundai Steel's actual volume of wastewater introduced into the public system was

25

NON-CONFIDENTIAL

[      ] percent *less* than the volume of clean water it consumed. *Id.* In other words, based on the Incheon Metropolitan City's presumption in Article 14 of the Ordinance, Hyundai Steel was being *overcharged* in its sewerage fees by [      ] percent.

To remedy this overcharge, Hyundai Steel submitted the Kyung Hee University's report, along with its application under Article 21(1)(7) of the Ordinance, to the regional authority. *See* Appx15026-15051. The purpose was to demonstrate (i) that Hyundai Steel is able to measure the volume of sewerage it introduces into the public system, and (ii) that its actual sewerage discharge is much less than its clean water consumption volume. *Id.* Hyundai Steel's application was approved by the regional authority, with notice that Hyundai Steel would be liable if any discrepancies were found between its application and report and future verifications conducted by city officials. Appx15027, Appx15040. Hyundai Steel was then billed for its sewerage usage based on the proven volume of wastewater it introduced into the public system. *See* Appx15020; Appx15259-15260 (demonstrating how Hyundai Steel's sewerage fee was directly proportional to its volume of wastewater on the sample water bill provided by the Government of Korea).

26

As the facts above make plain, Hyundai Steel qualified under Article 21(1)(7) of the Ordinance and Article 9 of the Enforcement Regulation to pay its sewerage fees based on actual usage. The facts also demonstrate that Hyundai Steel in fact paid the entirety of the sewerage usage fees that were due based on its demonstrated usage of the public water system. Appx14976-14977, Appx15020; Appx15261-15262. Hyundai Steel and the Government of Korea both stated that Hyundai Steel did not receive any discounts, nor are there any discounts reported in Hyundai Steel's water bill. *Id.* This payment based on actual usage was consistent with the governing national law, Article 36(2) of the Presidential Decree, which "stipulates that the service fee for the public sewerage system usages must be calculated on the basis of the amount and type of the sewage water drained down the system." Appx14974.

<blockquote>

b.   **Commerce's Conclusion That Korean Law Did Not Provide For Hyundai Steel's Sewerage Fee Reductions Is Not Supported By Substantial Evidence And Is Contrary To Law.**

</blockquote>

Despite this detailed and consistent record evidence from Hyundai Steel and the Government of Korea regarding the legal basis for Hyundai Steel's reductions in sewerage fees, Commerce disregarded these record facts and essentially said "we do not believe you."

Specifically, Commerce found that "Article 21, or any other legal provisions cited by the Government of Korea, do not explicitly provide that entities may claim a reduction in their overall water bill with regard to the amount of sewage water discharged." Appx1051. No analysis or discussion is provided about Article 21(1)(7) to explain why Commerce found that this catch-all provision did not apply to Hyundai Steel's situation. Instead, Commerce simply asserts that "Hyundai Steel did not qualify for a reduction in its sewage fee" under Korean law because the laws "do not explicitly provide" that entities may receive the type of treatment that Hyundai Steel did. *Id.* This conclusion relies entirely on "mere assumptions, which find no apparent support in record evidence" and in fact contradict certified statements made by Hyundai Steel and the Government of Korea. *Jinan Yipin Corp. v. United States*, 31 CIT 1901, 1933-34, 526 F. Supp. 2d 1347, 1375-76 (2007). This is not evidence, let alone substantial evidence.

Moreover, Commerce's assumptions are refuted by the very application and approval documents that Hyundai Steel submitted, which both explicitly cite Article 21 of the Ordinance as the basis for the reduction in Hyundai Steel's sewerage fees. Appx15026-15027,

28

Appx15039-15040. Commerce's assumptions are also directly contradicted by both the Government of Korea and Hyundai Steel's responses that confirm that Hyundai Steel qualified for these sewerage reductions under Article 21(1)(7) of the Ordinance. Appx6213-6214; Appx14977-14979; *see also* Appx8234-8235; Appx15026-15027, Appx15039-15040. Instead of weighing this evidence in light of what both Hyundai Steel and the Government of Korea reported, Commerce "ignore{d} the evidence on one side of the scale," instead relying on its own assumptions regarding the sewerage system in Korea. *Commc'n Workers of Am. Loc. 4123 v. U.S. Sec'y of Labor*, No. 20-00075, Slip Op. 21-53, at 19 (Ct. Int'l Trade May 4, 2021). Commerce's determination is based on its own "conjecture or supposition," *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013), instead of "information requested from interested parties that: (1) is on the record; (2) was filed within the applicable deadlines; and (3) can be verified," as is required under the statute, Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103–316, vol. 1, at 869 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198. This is not

substantial evidence and does not support Commerce's decision in this case.

Furthermore, Commerce failed to give proper weight to the Government of Korea's explanation of its own domestic laws and relied instead on its own unexplained interpretation. This was error. In countervailing duty proceedings, Commerce requests information about alleged programs from foreign governments in order to determine whether they meet the three criteria necessary to be countervailable. Commerce requests this information because "normally, those governments 'are in the best position to provide information regarding the administration of their alleged subsidy programs, including eligible recipients.'" *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369-70 (Fed. Cir. 2014) (quoting *Essar Steel Ltd. v. United States*, 34 CIT 1057, 1070, 721 F. Supp. 2d 1285, 1297 (2010), *rev'd on other grounds by* 678 F.3d 1268 (Fed. Cir. 2012)). The foreign government can reasonably be regarded as the expert in its own laws in a countervailing duty proceeding.

Thus, in this case, when interpreting its own laws, the Government of Korea is the expert, not Commerce. Indeed, in understanding its own

laws, including those that are ambiguous, the Government of Korea possess the "relative expertness" and "unique expertise" that would afford Commerce deference in interpreting its organic statutes and its own regulations. *United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2001); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2413 (2019). At the very least, the Government of Korea possesses the "more specialized experience and broader . . . information" such that its explanations "constitute a body of experience and informed judgment" on which Commerce, and this Court, "may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944). It therefore defies the interpretive bases on which U.S. administrative law rests for Commerce to tell the Government of Korea that "{c}ontrary to {the Government of Korea's} claims," the Government of Korea's statutes and regulations "do not prescribe for the situation under which Hyundai Steel qualified for its sewerage usage fee reduction." Appx1051.

To be clear, we are not proposing that foreign governments are due the same level of deference as U.S. agencies in interpreting their organic statutes and regulations. Nor are we proposing that foreign governments are due any blind deference in proceedings before

31

Commerce under the statute. Commerce may be skeptical when foreign governments cite ambiguous foreign statutes and regulations as the basis for their alleged subsidy programs, and the statute gives Commerce tools to further scrutinize foreign government responses. *See e.g.*, 19 U.S.C. § 1677m(d) (instructing Commerce to issue supplemental questionnaires for deficient responses); *Id.* § 1677m(i) (allowing Commerce to verify).

That said, the statute does require that Commerce's determinations be supported "by substantial evidence on the record." *Id.* § 1516a(b)(1)(B)(i). As the expert in its own domestic law, the Government of Korea is in the "best position" to provide Commerce with the evidence needed to satisfy the statute. *Fine Furniture*, 748 F.3d at 1369-70. American jurisprudence simply reinforces this dynamic when confronting an ambiguous Korean law. Thus, the Government of Korea's interpretation of Article 21(1)(7) should not be disregarded out of hand and should be given adequate weight in Commerce's analysis – especially when there is no contrary evidence on the record. In other words, as this Court recently put it, Commerce should "trust but verify." *New Am. Keg v. United States*, No. 20-00008, Slip Op. 21-30, at 41 (Ct.

Int'l Trade Mar. 23, 2021) (borrowing an expression from President Reagan). Commerce failed to do so in the *Final Results*.

Finally, Commerce's primary basis for discarding the Government of Korea's interpretation of its own domestic law appears to be that none of the legal provisions "*explicitly* provide{s} that entities may claim a reduction in their overall water bill with regard to the amount of sewage water discharged." Appx1051 (emphasis added). In other words, Commerce appears to suggest that unless the Korean law "explicitly" describes the exact situation applicable to Hyundai Steel, then the Korean law must not apply. Such a standard is both unprecedented and unreasonable. If this Court were to accept such a standard then *any* ambiguous foreign law would be subject to Commerce's own interpretation. Such a standard is unreasonable and if applied to U.S. statutes and regulations would render most of the U.S. code useless, since it is littered with ambiguous provisions. Many of Commerce's own regulations would also be unusable. *See e.g.*, 19 C.F.R. § 351.511(a)(2)(iii) (providing that government prices are adequately remunerative when they are "consistent with market principles"). This

court's recent decision in *Shelter Forest Int'l Acquisition, Inc. v. United States*, 497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021) is instructive.

In *Shelter Forest*, Commerce was investigating whether certain later-developed merchandise (referred to as the "inquiry merchandise") was circumventing the antidumping and countervailing duty orders on *Hardwood Plywood from China*. *Id.* at 1393-94. In holding that Commerce's affirmative circumvention determination was not supported by substantial evidence, this court held that Commerce adopted such a narrow definition of the inquiry merchandise, that it "imposed impossible requirements on the {respondents} to show that inquiry merchandise was commercially available." *Id.* at 1396. "Such near impossibility" of Commerce's definition was reflected in Commerce's requirement that respondents provide evidence that actual compliance labels be physically "adhered to the product to demonstrate compliance, as opposed to accepting other evidence that could equally indicate the product met" the required specifications. *Id.* The court found that the lack of a "reasoned basis for the labeling requirement undermine{d} Commerce's {affirmative} determination." *Id.* at 1396-97.

34

Commerce's "explicit provision" standard applied in the *Final Results* employs similarly "impossible" requirements as Commerce employed in *Shelter Forest*. The law in Korea is what it is. It is no more and no less ambiguous than certain laws in the United States. Yet, in the *Final Results* Commerce suggests that the *only* way it would have accepted the Government of Korea's explanation of Hyundai Steel's sewerage fees is if the applicable laws "explicitly provide{d} that entities may claim a reduction in their overall water bill" in the manner that Hyundai Steel did. Appx1501. In other words, unless the Government of Korea literally changed the words of the statutes and regulations, Commerce would not accept its explanation and would instead determine that the relevant legal provisions do not apply to Hyundai Steel. *Id.*

Such a narrow view of ambiguous regulations imposes "impossible requirements" on Hyundai Steel and the Government of Korea to demonstrate that the legal provisions of Korea's public sewerage system apply to Hyundai Steel's case. Similar to the respondents in *Shelter Forest*, Commerce imposed such "impossible requirements" instead of accepting equally indicative evidence, such as citations to Article 21 of

35

the Ordinance on Hyundai Steel's application and approval documentation. *See* Appx15026-15027, Appx15039-15040; *Shelter Forest*, 497 F. Supp. 3d at 1396-97 (requiring that respondents' provide evidence that the actual certification labels were adhered to their products). Like in *Shelter Forest*, without a "reasoned basis" for applying such "impossible requirements" on Hyundai Steel and the Government of Korea, Commerce's *Final Results* are not supported by substantial evidence and are otherwise not in accordance with law.

### 2. The Amount Of The Sewerage Fee Reductions Received By Hyundai Steel Are Consistent With Korean Law.

The second basis for Commerce's rejection of the Government of Korea's and Hyundai Steel's position that Hyundai Steel qualified for the sewerage fee exemptions under Article 21(1)(7) is that "the amount of the fee reduction that Hyundai Steel received on its overall water bill significantly exceeds the rate adjustments that are specified in the ordinance." Appx1051. However, the "rate adjustments" against which Commerce compares Hyundai Steel's fees are completely irrelevant to Hyundai Steel's fees, and there is no evidence to support that Hyundai Steel's reductions exceeded those provided for under Korean law. In fact, Hyundai Steel's sewerage fee reductions were fully consistent with

36

Korean law that seeks to charge fees based on actual usage of the public sewer system.

The factual basis for Commerce conclusion appears to be Appendix 4 of Article 21 of the Ordinance, which list "Adjustment Rate{s}" for sewerage fees and the conditions that must be met in order to receive them. Appx15011, Appx15017. This Appendix lists various set percentage reductions for certain scenarios, such as persons declared to be in disaster areas, or persons who install and use gray water systems, or persons who receive recycled water from public sewerage facilities. *Id.* The percentage reductions for these scenarios range from 20 percent to 100 percent. *Id.* Commerce appears to be saying that since Hyundai Steel's reduction was higher the 20 percent reduction that applied to persons who installed gray water systems or who received recycled water, it must not have been provided under Article 21 of the Ordinance. Not only is this flawed reasoning, it also ignores other provisions that completely undermine this logic.

First, and most importantly, Article 21 of the Ordinance is clear that *none* of these rates or criteria in Appendix 4 even apply to Article 21(1)(7) of the Ordinance. Specifically, Article 21(2) states that "{t}he

37

reduction and exemption standards for *subparagraphs 1 through 6* of Paragraph 1 shall be set forth in Appendix 4." Appx15010, Appx15016 (emphasis added). As both the Government of Korea and Hyundai Steel have made abundantly clear, Hyundai Steel's sewerage fees were recalculated based on subparagraph 7 of Article 21(1) (*i.e.*, Article 21(1)(7)), which is not governed by the rates set forth in Appendix 4. *See* Appx6213, Appx14977. There is thus no basis to conclude that Hyundai Steel's reduction rates should be consistent with those listed in Appendix 4.

Second, even if Appendix 4 did apply there is no reason to think that the percentage reduction in sewerage fees for a customer like Hyundai Steel, which is paying fees based on proven usage, should be in parity with the set percentages listed in Appendix 4. These set percentages apply to persons that are not actually measuring their usage, and thus there is no reason to expect them to mirror the reductions for customers that do measure usage.

Finally, it is not even true that Hyundai Steel's reduction significantly exceeds those in Appendix 4. There are two scenarios listed in Appendix 4 that result in 100 percent reductions in sewerage fees,

38

NON-CONFIDENTIAL

and two that result in 20 percent reductions. Appx15011, Appx15017. Hyundai Steel's reduction based on actual usage was [      ] percent. *See* Appx15028-15038, Appx15041-15048. This falls between these two listed ranges and is in fact lower than two of the listed scenarios, and undermines Commerce's conclusion that Hyundai Steel's reduction "significantly exceeds" the reductions in Appendix 4.

    In sum, Commerce's basis for finding that Hyundai Steel did not qualify for sewerage fee reductions under Korean law is not supported by substantial evidence and is otherwise not in accordance with law. Other than rejecting the Government of Korea's and Hyundai Steel's reporting of the basis for the sewerage fee reductions, Commerce provides no analysis or explanation as to how the payment of sewerage fees based on actual proven usage results in a financial contribution and benefit. As discussed below, this method of payment of sewerage fees does not result in any financial contribution or benefit. Commerce's determination that Hyundai Steel received a counervailable subsidy thus cannot stand.

## B.   Hyundai Steel Did Not Receive A Countervailable Subsidy In Connection With Its Payment Of  Sewerage Usage Fees.

In order to find that a countervailable subsidy exists, Commerce must determine that a government authority has provided (i) a financial contribution, that (ii) confers a benefit, and that (iii) is specific. 19 U.S.C. § 1677(5)(B) & (5A). As discussed, Hyundai Steel is only challenging Commerce's findings regarding financial contribution and benefit. In the *Final Results*, Commerce found "that the reduction in Hyundai Steel's sewerage fee under the program constitutes revenue foregone and that a benefit was conferred in accordance with sections 771(5)(D)(ii) and 771(5)(E) of the Act, respectively." Appx1051. No other analysis or explanation was provided, aside from Commerce's finding that Hyundai Steel's sewerage fee reductions were not provided for under Korean law and significantly exceeded the rate adjustments specified in Appendix 4 to Article 21 of the Ordinance. As discussed below, the record shows that there was no financial contribution and no benefit provided to Hyundai Steel.

### 1. Hyundai Steel Received No Financial Contribution Because The Government Of Korea Did Not Forego Any Revenue Otherwise Due.

In the *Final Results*, Commerce found that "the reduction in sewerage fees from the standard rate under this program resulted in a financial contribution from the Government of Korea to Hyundai Steel in the form of revenue forgone, as described in section 771(5)(D)(ii) of the Act." Appx1050. The issue presented is whether this finding of financial contribution is supported by substantial evidence and is otherwise in accordance with law. Hyundai Steel contends that it is not because the record shows that, in accordance with Korean law, Hyundai Steel paid exactly what it should have paid based on its actual discharge of sewerage into the public sewer system.  There was thus no revenue foregone by the government that was otherwise due.

Section 1677(5)(D) provides that the term "financial contribution" means –

> (i) the direct transfer of funds, such as grants, loans, and equity infusions, or the potential transfer of funds or liabilities, such as loan guarantees,

> (ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income,

> (iii) providing goods or services, other than general infrastructure, or

41

(iv) purchasing goods.

19 U.S.C. §1677(5)(D). Determinations under § 1677(5)(D) are "made on a case-by-case basis," and the list of enumerated financial contributions is not exhaustive. Statement of Administrative Action, at 927, 1994 U.S.C.C.A.N. at 4240. However, it is also the case that "these generic categories are sufficiently broad so as to encompass the types of subsidy programs generally countervailed by Commerce in the past . . . ." *Id.*

Although what constitutes revenue foregone is not specifically defined, § 1677(5)(D)(ii) does connote that the revenue that is foregone must be "otherwise due." It appears that Commerce found that the Government of Korea was foregoing the additional revenue it would have "otherwise {been} due" absent the reduction in sewerage fees. That is, the Government of Korea was foregoing the revenue that would have otherwise been due using the rebuttable presumption that the amount of clean water consumed equals the amount of sewerage discharged. However, a careful examination of the operation of this program in its entirety reveals that there was no revenue foregone that was otherwise due because Hyundai Steel paid the entirety of the sewerage fees that

42

were due based on its actual demonstrated usage of the public water system. Appx14976-14977, Appx15020; Appx15261-15262.

As previously discussed, Hyundai Steel applied for and was approved to pay its sewerage usage fees based on its actual proven discharge of sewerage into the public sewer system under Article 21(1)(7) of the Ordinance. Appx6213, Appx8234-8235; Appx14976-14977, Appx15026-15027, Appx15039-15040. The actual discharged amount was based on a study performed by an independent third party and was subject to verification. Appx14976-14977, Appx15026-15051. Hyundai Steel and the Government of Korea both reported that Hyundai Steel did not receive any discounts, nor are there any discounts reported in Hyundai Steel's water bill. Appx14976-14977, Appx15020; Appx15261; Appx16028-16031. There is thus no evidence that Hyundai Steel received any reduction in excess of its actual usage, and in fact the evidence shows that Hyundai Steel paid exactly what it owed based on its proven usage. The Government of Korea thus was paid exactly what it was owed and did not forego any revenue that was otherwise due.

This payment method was consistent with Article 36(2) of the Presidential Decree that establishes the principle that sewerage fees

should be based on actual usage. Appx14974. Indeed, had Hyundai
Steel paid sewerage fees based on the rebuttable presumption that the
amount of clean water consumed was equal to sewerage discharged, it
would have overpaid and the Government of Korea would have received
extra revenue that was not "otherwise due." Specifically, the Incheon
Metropolitan City's default basis for calculating sewerage fees (Article
14(1) of the Ordinance) resulted in an *overcharge* to Hyundai Steel that
was inconsistent with the national law (Article 36(2) of the Presidential
Decree). *See also* Appx16031-16032. Correcting an overcharge of fees is
*not* "foregoing or not collecting revenue that is otherwise due," and
applying § 1677(5)(D)(ii) in this case would render the term "otherwise
due" void of any meaning, which neither this Court nor Commerce
should do. *Corley v. United States*, 556 U.S. 303, 314 (2009) ("A statute
should be construed so that effect is given to all its provisions, so that
no part will be inoperative or superfluous, void or insignificant.")
(quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)) (internal quotations
omitted).

Lastly, as this court stated in *Government of Sri Lanka v. United
States*, 308 F. Supp. 3d 1373, 1380 (Ct. Int'l Trade 2018) ("*GOSL*"), it is

44

inconsistent with the statute to "selectively analyz{e} the {reduction} in isolation from the overall . . . program." This is to say that Commerce cannot simply analyze the "reduction" in Hyundai Steel's overall sewerage fees without also considering what the Incheon Metropolitan City is "otherwise due" under the national law, and what Hyundai Steel would have paid under the City's rebuttable presumption. As explained above, the facts make clear that (i) the Incheon Metropolitan City is due fees based on actual usage of the public sewer system under the national law, and that (ii) Hyundai Steel would have been *overcharged* under the Incheon Metropolitan City's rebuttable presumption. Thus, when Hyundai Steel's sewerage usage fees are analyzed in their entirety under the Korean statutory and regulatory scheme, there is no basis to find that the Government of Korea provided a financial contribution to Hyundai Steel in connection with its payment of sewerage usage fees. Plainly stated, the Government of Korea did not forego any revenue otherwise due but instead collected sewerage fees based on Hyundai Steel's actual sewerage usage. This is not a financial contribution under the statute.

### 2. Hyundai Steel Did Not Receive A Countervailable Benefit Because The Sewerage Usage Fees Were Directly Proportional To Its Usage Of The Public Sewerage System.

In the *Final Results*, Commerce also determined that Hyundai Steel received a countervailable benefit under 19 U.S.C. § 1677(5)(E) from the reduction in the amount of sewerage fees it paid. Appx1051. This determination is unsupported by substantial evidence and is otherwise not in accordance with law because the sewerage fees paid by Hyundai Steel were directly proportional to its usage of the sewerage system.

The statute provides that a benefit is "normally" conferred when

(i) in the case of an equity infusion, if the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made,

(ii) in the case of a loan, if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market,

(iii) in the case of a loan guarantee, if there is a difference, after adjusting for any difference in guarantee fees, between the amount the recipient of the guarantee pays on the guaranteed loan and the amount the recipient would pay for a comparable commercial loan if there were no guarantee by the authority, and

(iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in

46

the case where goods are purchased, if such goods are purchased for
more than adequate remuneration.

19 U.S.C. § 1677(5)(E). The statute does not specifically address a

program such as sewerage fee reductions.

However, the examples enumerated in the statute are not

exhaustive. *See GOSL*, 308 F. Supp. 3d at 1382. Thus, Commerce's

regulations provide a "catch-all" provision for the benefit conferred from

other types of potential subsidies:

> For other government programs, the Secretary normally will
> consider a benefit to be conferred where a firm pays less for its
> inputs (e.g., money, a good, or a service) than it otherwise would pay
> in the absence of the government program, or receives more revenues
> than it otherwise would earn.

19 C.F.R. § 351.503(b)(1). While the catch-all provision "is not intended

to limit" Commerce's ability to impose countervailing duties, *id.*

§ 351.503(b)(2), this court has understood that "{t}he touchstone of

Section 1677(E), from which this regulation is derived, is that what the

company received somehow exceeded what the company paid or should

have paid," *GOSL*, 308 F. Supp. 3d at 1383.

This understanding of Commerce's catch-all provision comes from

Commerce's own explanation. In promulgating the regulation,

Commerce explained that its language "captures an underlying theme

47

behind the definition of benefit" contained in § 1677(5)(E) and "reflects the fundamental principles that {Commerce has} articulated over the years with respect to programs and practices that {Commerce has} determined confer either direct or indirect countervailable subsidies." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,359-60 (Dep't Commerce Nov. 25, 1998) ("*Preamble*"). This "underlying theme," according to Commerce, is that "in an overwhelming majority of cases, the recipient . . . enjoys a reduction in input costs or revenue enhancement that it would not otherwise have enjoyed absent the government action." *Id.* at 65,360. Thus, when evaluating whether the sewerage usage fees conferred a benefit to Hyundai Steel, the statute and Commerce's regulations direct the Court to examine whether these fees were less than what Hyundai Steel should have paid.

Here, it is clear that the sewerage fees paid by Hyundai Steel were exactly what it should have paid, and thus Hyundai Steel received no benefit. As discussed, Hyundai Steel rebutted the presumption that the amount of clean water it consumed is equivalent to the volume of wastewater it discharged into the sewage system. This was done in accordance with Article 21(1)(7) of the Ordinance. *See* Appx14977-

48

14979, Appx15010, Appx15016. Therefore, Hyundai Steel paid its sewerage fees based on the actual proven volume of sewage it discharged. *See* Appx15259-15260 (demonstrating how Hyundai Steel's sewerage fee was directly proportional to its volume of wastewater on the sample water bill provided by the Government of Korea). Nothing more and nothing less. This does not constitute a countervailable benefit under Commerce's own formulation of the standard. *See Preamble*, 63 Fed. Reg. at 65,360 (explaining that "in an overwhelming majority of cases, the recipient . . . enjoys a reduction in input costs or revenue enhancement that it would not otherwise have enjoyed absent the government action").

Commerce reached a contrary result only by ignoring the entire structure of the Korean sewerage system and focusing solely on the reduction of Hyundai Steel's fees. *See* Appx1022-1023; Appx1051. That is, Commerce just compared what Hyundai Steel would have paid based on the rebuttable presumption to what it paid based on actual proven usage and treated the difference as a benefit. However, in "selectively analyzing the {reduction} in isolation from the overall . . . program," Commerce missed the forest for the trees and committed error. *GOSL,*

49

308 F. Supp. 3d at 1380. The reduction of Hyundai Steel's sewerage fees cannot be viewed in isolation, and must be examined in light of the significant overcharge it initially incurred under the Incheon Metropolitan City's rebuttable presumption of Article 14(1) of the Ordinance.

When viewed in this light, it is clear that Hyundai Steel's "reduction" is no reduction at all, as it fully paid its sewerage usage fees as required under the national law. Hyundai Steel is thus not paying less than it should have paid. Instead, it is paying exactly what it should have paid. The payment of sewerage fees thus did not provide Hyundai Steel with a countervailable benefit under 19 U.S.C. § 1677(5)(E). *See id.* at 1383 ("The touchstone of Section 1677(E), from which this regulation is derived, is that what the company received somehow exceeded what the company paid or should have paid."). Commerce's conclusion that Hyundai Steel received a countervailable benefit thus cannot stand.

C.   **Hyundai Steel's Sewerage Fees Should Not Be Attributed To Production Of Subject Merchandise As They Are Tied To Non-Subject Merchandise, A Substantial Issue Commerce Failed To Address In The *Final Results*.**

1.   **Hyundai Steel's Sewerage Usage Fees Apply Only To Its Incheon Facility And Cannot Benefit Its Production Of Subject Merchandise.**

As Hyundai Steel explained in its case brief, it does not produce the subject merchandise at its Incheon facility. Rather, it produces the subject merchandise only at its Dangjin facility. The sewerage usage fees at issue in this case only pertain to Hyundai Steel's Incheon facility. Therefore, any benefit received by Hyundai Steel is by necessity tied to the production of non-subject merchandise. Commerce's finding to the contrary is unsupported by substantial evidence and is otherwise not in accordance with law.

Commerce's regulations provide that "{i}n general{,} {i}f a subsidy is tied to the production or sale of a particular product, {Commerce} will attribute the subsidy only to that product." 19 C.F.R. § 351.525(b)(5)(i). The exception to this rule is if the subsidy is tied to the "production of an input product," in which case the subsidy will be attributed to both the input and downstream products. *Id.* § 351.525(b)(5)(ii). Commerce's tying regulations attempt to create "a simple, rational set of guidelines

for reasonably attributing the benefit from a subsidy based on the stated purpose of the subsidy or the purpose we evince from record evidence at the time of bestowal." *Preamble*, 63 Fed. Reg. at 65,403. Accordingly, in order to determine whether a subsidy is "tied" to the production of a product, Commerce's focus is on the "purpose" of the subsidy. *Id.*

Commerce's "tying" regulations ensure that subsidies are appropriately attributed to the merchandise that actually benefit from them. As Commerce put it, "it would distort and be inconsistent with the clear intent of the statute, as reflected in its legislative history, to allocate to products under investigation any portion of benefits clearly tied to products not under investigation." *Final Affirmative Countervailing Duty Determinations; Certain Steel Products From Belgium*, 47 Fed. Reg. 39,304, 39,320 (Dep't Commerce Sept. 7, 1982). The "clear intent of the statute" is a reference to Congress's clear statement that when subsidies are provided to an enterprise in connection with their capital equipment or plant, it should be "assessed in relation to the products produced with such equipment or plant." H.R. Rep. No. 96-317, at 74-75 (1979). Indeed, in such an assessment,

Congress explicitly instructed that "{r}easonable methods of allocating the value of such subsidies over the production or exportation of the *products benefiting from the subsidy must be used*." S. Rep. No. 96-249, at 85 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 471 (emphasis added). Thus, it would be contrary to Commerce's legislative mandate to attribute subsidies to subject merchandise where there is clear evidence that the "purpose" of the subsidy is to benefit non-subject merchandise.

As discussed, Hyundai Steel produces subject merchandise at its Dangjin facility, and only at its Dangjin facility. Appx6174. In contrast, the sewerage fees at issue pertain to Hyundai Steel's Incheon facility, and only its Incheon facility. While Article 36(2) of the Presidential Decree applies nationally, the Ordinance applies only to the region under the Incheon Metropolitan City's jurisdiction (*i.e.*, Incheon). *See* Appx14975-1479, Appx15010-15012, Appx15015-15018. No facility outside of Incheon could utilize the provisions of Article 21 of the Ordinance to reduce its sewerage fees.

The purpose of the Ordinance is to calculate service fees for usage of the Incheon public sewerage system. Appx15010-15012, Appx15015-15018. There is no other purpose. The study that Hyundai Steel

53

commissioned only examined the sewerage usage of its Incheon facility,
Appx15028-15038, 15041-15051, and Hyundai Steel's application,
submitted to the *Incheon* regional authority, only lists the address of
the Incheon facility. *Compare* Appx15026, Appx15039, *with* Appx6248
(listing the addresses of all of Hyundai Steel's manufacturing facilities).
Likewise, the approval document issued by the Incheon Metropolitan
City only lists the Incheon facility's address, Appx15027, Appx15040,
and the sample water bill showing Hyundai Steel's sewerage fees was
issued by the Incheon Metropolitan City Water Supply Administration
and only lists the Incheon facility's address, Appx15020. Thus, the
record makes plain that to the extent the sewerage fees at issue provide
a "benefit," such a benefit is directly tied to the products produced at
Hyundai Steel's Incheon facility.

This court's decision in *Borusan Mannesmann Boru Sanayi ve
Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015)
is on point. In that case, this court found that hot-rolled steel allegedly
provided for less-than-adequate remuneration directly to respondent's
"non-subject-merchandise-producing" mill was not relevant to the rate
attributable to subject merchandise. *Id.* at 1347. Here, the sewerage

fees at the "non-subject-merchandise-producing" Incheon plant is

similarly "not relevant to the *attributable*" subsidy calculation of

Hyundai Steel's subject merchandise, "and therefore such information

is, strictly and legally speaking, not 'necessary' information." *Id.*

Commerce's "mandate" in this case was to investigate the subsidization

of Hyundai Steel's subject merchandise and "d{id} not include policing

the entire {Korean} product line" that incurs sewerage fees. *Id.* at 1349.

Accordingly, this Court should find that Hyundai Steel's sewerage fees

were tied to non-subject merchandise and thus not countervailable in

this administrative review.

> **2.   Commerce's *Final Results* Are Not Supported By Substantial Evidence Because They Fail To Address Hyundai Steel's Argument That The Sewerage Usage Fees Are Tied To Non-Subject Merchandise.**

Despite Hyundai Steel arguing that any benefits from its sewerage

usage fees are tied to non-subject merchandise in its case brief,

Commerce utterly failed to even address it. This failure renders its

decision unsupported by substantial evidence.

In every determination, Commerce "must explain the basis for its

decisions {and} while its explanations do not have to be perfect, the path

of Commerce's decision must be reasonably discernible to a reviewing

court." *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). When Commerce "entirely fail{s} to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, or fails to "address important factors raised by comments from petitioners and respondents," it "fail{s} to comply with its *State Farm* obligation to provide an adequate explanation," *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373-74 (Fed. Cir. 2011). *Accord Nucor Corp. v. United States*, 461 F. Supp. 3d 1374, 1380 (Ct. Int'l Trade 2020) ("{T}he court will not sustain Commerce's determination when Commerce failed to address a party's relevant argument.").

Hyundai Steel was clear in its case brief that any "benefit" from its sewerage usage fees is tied to the production of non-subject merchandise. Appx15263-15264. Specifically, Hyundai Steel pointed to the record evidence that showed that the sewerage fees at issue applied only to Hyundai Steel's Incheon facility, the independent study only covered the Incheon facility, the water bills were issued to the Incheon facility, and thus "at the time of bestowal, these fee reductions were tied only to the Incheon facility." *Id.*

Nowhere in the *Final Results* does Commerce address Hyundai Steel's tying argument. *See* Appx1050-1052. Had Commerce considered and adopted Hyundai Steel's position, then it would have found that these fees were *not* countervailable. *See Borusan*, 61 F. Supp. 3d at 1349. That is, Hyundai Steel's argument would have required Commerce to change its position and thus presented an issue of "cogent materiality" that Commerce left "completely unanswered." *New Am. Keg*, Slip Op. at 48 (citation omitted); *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 549 (D.C. Cir. 1997).  Commerce "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, and thus its decision is not supported by substantial evidence. A remand is thus required.

## VII.  CONCLUSION AND RELIEF REQUESTED

Based on the foregoing, Hyundai Steel respectfully requests that this Court (i) hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with the law; (ii) remand the case to Commerce with instructions to correct the errors identified by the Court; and (iii) for such other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Plaintiff Hyundai Steel Company*

58

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 10,838 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

<u>/s/ Brady W. Mills</u>